**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

           Plaintiff,

v.                                                  CRIMINAL ACTION NO. 2:09-cr-00225

MARLAND E. WILLIS,

           Defendant.

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant's Motion to Suppress Evidence, which requests the suppression of cocaine base and Defendant's statement to the police [Docket 29]. The Government filed a timely response to the motion. (Docket 32.) The Court held a hearing on this motion on April 1, 2010, where the Court took the motion under advisement and gave counsel the opportunity to file additional memoranda on the suppression issues. Having received additional memoranda from the Defendant and the Government, (Dockets 46, 47, & 48), the suppression motion is now ripe for the Court's consideration.

*I. FACTUAL BACKGROUND*

On June 17, 2009, Corporal Christopher Young of the Oak Hill Police Department received a telephone call from an informant, "Nick," complaining about a black male outside of 106 High Street, Oak Hill, West Virginia, who was threatening the occupants of the home.[1] Corporal Young

---

[1] Corporal Young had received information from Nick prior to June 17, 2009, that related
(continued...)

then went to the West Virginia State Police Detachment in Oak Hill to relay the information to Trooper C.L. Adkins. Adkins and two other officers, Trooper R.E. Stephenson and Sergeant C. A. Light, went with Adkins to 106 High Street to investigate the call. The officers went to the front door of the house and Adkins knocked on the door. The defendant, Marland Willis, answered the door. Adkins explained to Defendant that the officers were there in response to a complaint. Then Adkins asked about the owner of the home, Robert England. Defendant responded that Mr. England was in the house and that Defendant would go get him. Adkins explained that because of the nature of the complaint he did not want Defendant to go find Mr. England, instead Adkins directed Defendant outside towards Stephenson.

Stephenson then began a pat-down of Defendant to check for weapons. During the pat-down, Stephenson noticed a Crown Royal bag[2] hanging out of Defendant's back pocket. Stephenson testified that when he felt Defendant's back pocket he felt something in the bag that could possibly be crack cocaine. Stephenson asked Defendant what was in his pocket, and Defendant stated that it was "work" and it "wasn't his." Stephenson testified that, based on his experiences, he understood "work" to mean drugs. Stephenson then pulled the bag out of Defendant's pocket, opened the bag, and observed an object in the bag that he believed was crack cocaine. Adkins and Light then went

---

[1](...continued)
to activities at 106 High Street. Nick lived in the area of 106 High Street, and had previously called Corporal Young to complain about drug use and possible drug sales at that address. Corporal Young also received information from Nick relating to witnessing black males with firearms in the yard of 106 High Street. Corporal Young testified that he knew where Nick lived and could find him if needed.

[2] Crown Royal is a brand of alcohol, the bottle of which is often packaged in a distinctive bag or pouch with a draw string.

into the house to search the residence while Defendant remained with Stephenson. Subsequently, Defendant was arrested and taken to the Oak Hill Detachment.

## II. DISCUSSION

### A. The Stop Was Justified at its Inception

The Fourth Amendment protects citizens from "unreasonable searches and seizures." U.S. Const. amend IV. There are many situations that can qualify as a search or seizure. For this matter, a search is "a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons," and a seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." *Terry v. Ohio*, 392 U.S. 1, 17 (1967). Defendant was subjected to a search and seizure when Trooper Adkins directed Defendant to go to Trooper Stephenson, and Stephenson patted down Defendant.

To decide whether police conduct falls within the bounds of the Fourth Amendment's protection against unreasonable searches and seizures, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21. When an officer investigates suspicious activity and justifiably believes that the individual he is investigating might be armed and dangerous, the officer has "the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24. "[A]n officer may not conduct this protective search for purposes of safety until he has a reasonable suspicion that supports the investigatory stop." *United States v. Burton*, 228 F.3d 524, 528 (4th Cir. 2000).

In determining whether an officer has reasonable suspicion to support an investigatory stop, the Court must "consider the 'totality of the circumstances' . . . to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Mayo*, 361 F.3d 802, 805 (4th Cir. 2004) (citations omitted). The Supreme Court stated:

> The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Terry*, 392 U.S. at 27. "[V]arious individual factors [are] traditionally relied upon by police officers, such as whether the stop occurred in a high-crime area . . . or whether the suspect engaged in evasive behavior or acted nervously." *Mayo*, 361 F.3d at 805-06 (citations omitted); *see also United States v. Constantine*, 567 F.2d 266, 267 (4th Cir. 1977) ("An area's disposition toward criminal activity is an articulable fact."). Moreover, "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *Florida v. J.L.*, 529 U.S. 266, 271 (2000). Importantly, "the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his own subjective intent or motivation." *United States v. Swann*, 149 F.3d 271, 276 (4th Cir. 1998) (quoting *Martin v. Gentile*, 849 F.2d 863, 869 (4th Cir. 1988)).

An anonymous tip that a person is carrying a gun, without more, is not sufficient to justify a *Terry* stop and frisk. *Florida*, 529 U.S. 266. An anonymous tip can provide grounds for a *Terry* stop when it is "suitably corroborated" and exhibits "sufficient indicia of reliability to provide reasonable suspicion." *Florida*, 529 U.S. at 269 (quoting *Alabama v. White*, 496 U.S. 325 at 329 (1990)). However, in this case, the tip was not anonymous. Corporal Young had previous contact

with the caller, Nick, and could locate Nick if the information was not reliable. Nick was therefore a "known informant whose reputation [could] be assessed and who [could] be held responsible if [his] allegations turn[ed] out to be fabricated." *Adams v. Williams*, 407 U.S. 143, 146-47 (1972); *see also United States v. Perkins*, 363 F.3d 317 (4th Cir. 2004).

Moreover, "police observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch." *Perkins*, 363 F.3d at 322 (quoting *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003)). When police encountered Defendant, they had arrived within minutes of receiving the information, observed a person who fit the description in the tip, and encountered the person at 106 High Street, the very place described in the tip.

In addition, Trooper Adkins knew Defendant from a previous drug case where Defendant pled guilty to distributing cocaine base in violation of 21 U.S.C. § 841(a)(1). Adkins was the case agent in that matter, so this past experience with Defendant reinforced his suspicions of possible criminal activity. Only after these corroborating factors became apparent, did Trooper Adkins send Defendant to Trooper Stephenson to be patted down.

Further, Corporal Young had relayed Nick's tips to Trooper Adkins, thus Trooper Adkins was aware of the allegations that drug trafficking was going on at 106 High Street and that firearms may have been seen there in the past. In addition, Trooper Adkins's colleague, Trooper Stephenson, made an arrest at 106 High Street of Bryson England who alleged that drug trafficking was occurring at that residence. Further, Adkins was aware of a "Crime Stoppers" tip that alleged that Robert England dealt crack out of 106 High Street, that people smoked crack in the yard, that

5

Defendant was seen there, and that Robert England and Defendant were dangerous individuals. Thus, the Court **FINDS** that the totality of the circumstances confirms that the officers were within their bounds to subject Defendant to a *Terry* stop and frisk. The officers had reasonable suspicion that drug activity was taking place at 106 High Street, and related to that activity, weapons might be involved. Accordingly, the pat-down was necessitated so that the officers could ensure safety for themselves and anyone in the area.

  *B. The Removal of the Crown Royal Bag Was Within the Legitimate Scope of the Frisk*

  Because the *Terry* stop of Defendant was valid, the issue becomes whether Trooper Stephenson exceeded the scope of what is permissible under the Fourth Amendment. "[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry*, 392 U.S. at 18 (citations omitted). The scope of a search "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Id.* at 26.

  In *Minnesota v. Dickerson*, 508 U.S. 366 (1993), the Supreme Court set forth the "plain feel" doctrine, "which holds that contraband discovered during a lawful *Terry* stop is admissible so long as the search does not exceed the bounds permitted by *Terry*." *United States v. Raymond*, 152 F.3d 309, 312 (4th Cir. 1998). An officer may lawfully seize contraband if the officer "lawfully pats down [the] suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent." *Dickerson*, 508 U.S. at 375. "Once an officer has determined that the object is not a weapon, however, and if its shape or size does not indicate its contraband nature, the search must stop." *Raymond*, 152 F.3d at 313 (citing *Dickerson*, 508 U.S. at 378).

However, the plain feel doctrine "does not require absolute certainty that the object is contraband." *United States v. Jones*, 303 F. Supp. 2d 702, 706 (D. Md. 2004). "To the contrary, the plain feel doctrine, like the plain view doctrine, only requires that the officer have probable cause to believe that the object is contraband by the time he realizes it is not a weapon." *Id.* (citations omitted). At the other end of the spectrum, the officer is not allowed to determine if an item is contraband by "squeezing, sliding, and otherwise manipulating the contents of defendant's pocket." *Dickerson*, 508 U.S. at 378 (disapproving of officer who engaged in this behavior after he already knew that the item in the defendant's pocket was not a weapon).

At the time of the June 17 incident, Trooper Stephenson had significant experience dealing with drug investigations. He was also familiar with Defendant and 106 High Street. Stephenson had participated in the 2003 investigation of Defendant that resulted in Defendant's guilty plea for distribution of cocaine base, and he was also aware of the tips concerning 106 High Street that involved drug activity and Defendant. Additionally, in May 2009, Stephenson arrested Bryson England at 106 High Street. Bryson England had also alleged to Stephenson that drug activity was taking place at 106 High Street. So, Stephenson had an abundance of background information relating to Defendant and activity at 106 High Street before arriving at the scene on June 17.

On June 17, Trooper Stephenson knew that the officers were there to investigate a tip that had reported a black male standing in the yard of 106 High Street and threatening the occupants of that residence. When Adkins encountered Defendant at the door, Adkins directed Defendant to go to Stephenson, and Stephenson began a valid pat-down of Defendant to search for weapons. In the course of this pat-down, Stephenson observed a Crown Royal bag hanging out of Defendant's

pocket.  Stephenson said that Crown Royal bags are often used to carry drugs.[3]  When Stephenson felt the pocket, he felt a lump that was hard and round, and that he believed could possibly be crack cocaine.  Further, in response to Stephenson's inquiry as to what the object was, Defendant said it was "work," meaning drugs.[4]  Under the plain feel doctrine, Stephenson was able to seize the Crown Royal bag and the possible contraband.  *See Jones*, 303 F. Supp. 2d 702.  Based upon the totality of the circumstances, including the feel of the lump, the bag Trooper Stephenson saw, as well as what he knew about the location, the Defendant and his experience as a drug investigator, at the time Stephenson realized the lump was not a weapon, he had probable cause to believe that the lump in Defendant's pocket was illegal contraband.  Accordingly, the Court **FINDS** that Stephenson's seizure of the Crown Royal bag and the cocaine base were within the proper scope of a *Terry* stop and frisk.  Thus, the Court **DENIES** the suppression of the cocaine base.

---

[3] Trooper Stephenson's assertion about Crown Royal bags finds some support in case law. *See United States v. Brothers*, 438 F.3d 1068, 1069-70 (10th Cir. 2006) ("According to Officer Kennedy, suspects often 'put drugs, ammo, guns and several illegal items into Crown Royal Bags.'"); *United States v. Pennington*, 287 F.3d 739, 746 (8th Cir. 2002) (The officer saw a Crown Royal bag, "a type of bag commonly used to carry or conceal illegal drugs."); *United States v. Jackson*, 182 F.3d 923 (7th Cir. July 1, 1999) ("[T]he officers observed a Crown Royal bag, commonly used to carry drugs."); *United States v. Hendrix*, No. 401CR173DJSMLM, 2001 WL 1863558 (E.D. Mo. Aug. 29, 2001) ("Knowing the information given by the CI and upon seeing the Crown Royal string hanging out of defendant's pants and seeing a bulge there, the officers had reasonable suspicion that defendant might be up to some criminal activity.").

[4] Defendant complains that he had inadequate notice of his statement to Trooper Stephenson.  Indeed, the record reflects that the government filed a disclosure of this specific statement on the day of the hearing.  It is apparent from the examination of Stephenson that the statement appears in none of the documents that had previously been produced in the case.  The obvious inference is that the government learned of the statement for the first time in the course of preparation for the suppression hearing.  Nonetheless, counsel for the Defendant conducted a thorough cross examination of Stephenson on the subject.  Moreover, although the statement adds considerable weight to the Court's probable cause finding, even if the statement is disregarded, the Court would nonetheless conclude that probable cause existed.

*C. Defendant's Statement to the Police Was Not Fruit of the Poisonous Tree*

The judicially fashioned remedy for Fourth Amendment violations is the exclusion of unlawfully seized evidence. *See Hudson v. Michigan*, 547 U.S. 586, 590–91 (2006); *see also Mapp v. Ohio*, 367 U.S. 643, 655 (1961). To increase the deterrent effect of the exclusionary rule, evidence subsequently "obtained as a direct result of an unconstitutional search or seizure" is excluded from trial as "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

Defendant moved for the suppression of his statement taken by the West Virginia State Police as fruit of an unreasonable search and unlawful arrest. Because the search and seizure were both valid and there was no violation of the Fourth Amendment, there was no "poisonous tree," and thus no reason for the Court to exclude any "fruit." Therefore, the Court **DENIES** Defendant's request for suppression of his statement to the police.

### III. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant's Motion to Suppress Evidence [Docket 29].

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to Defendant and counsel, and the United States Attorney.

ENTER: April 22, 2010

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE